**Wendy N. LATCHUM, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 00–00826 SOM/KSC.**

United States District Court,
D. Hawai'i.

Nov. 1, 2001.

Michael D. Formby, Frame Formby & O'Kane (argued), Honolulu, HI, Vladimir Devens, Winer & Meheula, Kailua, HI, for Plaintiffs.

David E. Dauenheimer United States Department of Justice, Torts Branch, Civil Division (argued), Washington, DC, for Defendants.

## ORDER GRANTING GOVERNMENT'S MOTION TO DISMISS

MOLLWAY, District Judge.

### I. *INTRODUCTION.*

This case arises out of the murder of a military serviceman on vacation with his family at the Waianae Army Recreational Center ("WARC") in Hawaii. Chief Warrant Officer 2 John R. Latchum ("Latchum") was fatally shot by a person who was not in the military as Latchum stood on the porch of the cabin he and his family were renting at WARC. Pursuant to the Federal Tort Claims Act ("FTCA"), Latchum's wife, two young children, and estate (collectively, "Plaintiffs") are suing the United States of America (the "Government") for up to $8,500,000, claiming that the Government's negligence contributed to Latchum's death.

Pursuant to Fed.R.Civ.P. 12(b)(1), the Government, relying on the *Feres* doctrine, has moved to dismiss Plaintiffs' claims for lack of subject matter jurisdiction. This court has been faced with the *Feres* doctrine before and has each time undertaken a very fact-specific analysis to determine whether *Feres* did or did not bar the servicemember's claims. Plaintiffs argue here that the *Feres* doctrine has been applied by courts too broadly and that this court should follow the original intent of the *Feres* doctrine. This court, however, is bound by appellate rulings that have examined that doctrine. Although the court agrees with Plaintiffs that barring their claims is a harsh result, this court is compelled by governing precedent to conclude that their claims are indeed barred by the *Feres* doctrine. Accordingly, the court grants the Government's motion to dismiss.

### II. *BACKGROUND FACTS.*

Latchum was an "active duty" serviceman at the time of his death. *See* Exhibit 1, Tab A (Latchum's Officer Record Brief). While Latchum was on authorized leave for eleven days, *see* Exhibit 1, Tab E (authorized leave request), he and his wife and children rented a cabin at WARC. Complaint ¶ 11. Plaintiffs allege that the United States was negligent and that, as a result, on or about June 3, 1998, Latchum was shot and killed by "unlawful trespassers upon WARC property." *Id.*

There is no dispute that WARC is owned and operated by the Department of the United States Army. *See* Declaration of Randall K. Tsuneyoshi (June 6, 2001) ¶¶ 2, 6. WARC is operated as part of the Army's Morale, Welfare, and Recreation ("MWR") program. Declaration of Lt.

Col. Beverly S. Cardinal[1] (June 13, 2001) ¶ 4. The MWR program is a quality-of-life program that is intended to "support readiness" by providing a variety of community, soldier, and family support activities and services. The MWR program includes social, fitness, recreational, educational, and other activities that promote mental and physical fitness and generally provide a working and living environment that attracts and retains quality soldiers. *Id.;* Army Regulation ("AR") 215–1, ¶¶ 1.7(a), 1.8(c), 1.9 (attached to Cardinal Decl. as Tabs 1 to 3); Department of Defense ("DOD") Directive No. 1015.2 (June 14, 1995), ¶ 4 (attached to Declaration of Lester T. Akeo Decl.).[2] The MWR program is designed to meet the needs of those involved with a military installation, including not only the soldiers, but also retirees and civilian employees, as well as their families. Cardinal Decl. ¶ 4; AR 215–1, ¶ 1.8(a).

MWR programs are established primarily for active duty military personnel. Cardinal Decl. ¶ 7; AR 215–1, ¶ 6.2(a) (attached to Cardinal Decl. as Tab 7). Accordingly, active duty military personnel, their guests, and their families receive first priority for use of MWR programs. AR 215–1, ¶ 6.2(a). "All others have equal access after first priority patrons, on a first come basis, unless determined otherwise by the local commander." *Id.* Local rules govern priority for using WARC facilities. Under the Standard Operating Procedure for the WARC ("SOP WARC"), active duty Army personnel and their families have the highest priority to use WARC facilities. All other active duty military personnel and their families have second priority. Various civilians employed with the Department of Defense and other federal employees have lower priority. *See* SOP–WARC, App. A (attached to Exhibit 1, Tab B). The general public cannot rent cabins at WARC. Declaration of Gerald L. Reyes (June 14, 2001) ¶ 6.

Because Latchum was on active duty, he and his family had first priority to use WARC. Declaration of Lester T. Akeo (July 25, 2001) ¶ 6. There is no dispute that active duty Army and Army reserve members could reserve cabins 90 days in advance, other military active duty and reserve members could reserve cabins 80 days in advance, DOD civilian employees could reserve cabins 60 days in advance, and other federal employees could reserve cabins 30 days in advance. On the day Latchum was killed, 37 out of 39 cabins at WARC were occupied, 23 by active duty military, 11 by retired military, 2 by military reservists, and 1 by a DOD civilian. Akeo Decl. ¶ 7; Tab 5 to Akeo Decl. (guest ledger); *see also* last page of Ex. D to Declaration of Michael D. Formby (undated but filed April 11, 2001) (map of WARC indicating the existence of 39 cabins). Akeo says that the cabins are almost exclusively rented by active duty and retired military, as well as reservists. Akeo says that federal employees (those with the lowest priority) are rarely able to rent cabins at WARC. Akeo Decl. ¶¶ 7–8.

WARC is an Army nonappropriated fund instrumentality ("NAFI") of the United States, which appears to mean that it does not receive funding from the Army's budget. Cardinal Decl. ¶ 6. Nevertheless, NAFIs like WARC are "considered inte-

---

1. Cardinal was the Director, Directorate of Community Activities, United States Army Garrison, Hawaii, on June 3, 1998. In that capacity, she had overall responsibility for WARC. Cardinal Decl. ¶ 1.

2. At the hearing on this motion, the parties stipulated to the authenticity of all of the documents attached to papers supporting and opposing the motion.

gral and essential to the conduct of the military mission." AR 215–1, ¶ 3.1(b)(9) (attached to Cardinal Decl. as Tab 5); DOD Directive No. 1015.2, ¶ 4.2 ("The Department of Defense recognizes that MWR programs are vital to mission accomplishment and form an integral part of the nonpay compensation system").

Installation commanders plan, manage, and operate MWR programs. Cardinal Decl. ¶ 5; AR 215–1, ¶ 2.4 (attached to Cardinal Decl. as Tab 4). On July 3, 1998, operations at WARC were governed by the following chain of command:

1. Maj. Gen. James T. Hill, Commander 25th Infantry Division (Light) and United States Army;
2. Brig. Gen. James L. Campbell, Assistant Division Commander for Support, 25th Infantry Division;
3. Col. James T. Hirai, Commander United States Army Garrison, Hawaii;
4. Lt. Col. Beverly S. Cardinal, Director, Directorate of Community Activities;
5. Ted Otaguro (Civilian), Cardinal's Deputy;
6. Richard Ambrose (Civilian), Chief, Business Recreation Division; and
7. Lester Akeo (Civilian), Manager WARC

Cardinal Decl. ¶ 2. Although civilians had day-to-day control over the management of WARC, Lieutenant Colonel Cardinal had overall responsibility for WARC. This meant that policy changes, and all major improvements (including renovations, safety, fences, lighting) came through or were initiated by her because they required larger expenditures of nonappropriated funds. Cardinal Decl. ¶ 1. Additionally, Cardinal briefed her superiors, Brigadier General Campbell and Colonel Hirai, on important matters relating to WARC on a monthly basis. *Id.*

Law enforcement operations at WARC were supervised by the Provost Marshal's Office, Fort Shafter, under a chain of command separate from that of the Directorate of Community Activities.[3] Cardinal Decl. ¶ 3. Accordingly, the number and type of security officers at WARC was determined by the Provost Marshal's Office, Fort Shafter. Reyes Decl. ¶ 5. On June 3, 1998, law enforcement operations at WARC were governed by the following chain of command:

1. Maj. Gen. James T. Hill, Commander 25th Infantry Division (Light) and United States Army Garrison, Hawaii;
2. Col. James T. Hirai, Commander United States Army Garrison, Hawaii;
3. Col. Manolito Garabato, Commander Military Police Brigade Hawaii;
4. Lt. Col. Rose M. Miller, Provost Marshal Fort Shafter;
5. Fred MaKinney (Civilian), Company Commander, Department of Army Civilian Police, Fort Shafter;
6. Gerald Reyes (Civilian), Detachment Commander, Department of Army Police, WARC;
7. Department of Army Police Officers and Military Police Officers assigned to WARC.

Declaration of Rose M. Miller (June 1, 2001) ¶ 2.

Although WARC is a military facility, the general public is allowed to enter WARC's front gate (which is manned 24 hours a day by an armed officer) on foot to get to the beach. Reyes Decl. ¶ 6. The area surrounding the rental cabins is off-limits to anyone other than the occupants and their guests. *Id.* The Government

---

**3.** At the time of Latchum's death, Lt. Col. Rose M. Miller was the Provost Marshal, Fort Shafter, Hawaii. Declaration of Rose M. Miller (June 1, 2001) ¶ 1.

says that Army Police officers patrol the area regularly, stopping and questioning individuals who do not appear to be occupants or guests of WARC. *Id.* However, civilians walking to and from the beach may use the soda machines located next to the parking lot and the public showers. Deposition of Lester T. Akeo (July 17, 2001) at 50–51. There is some evidence indicating that civilians have, in the past, entered WARC property to commit crimes.

While utilizing WARC facilities, Latchum was governed by Army Regulations, WARC rules, and other military rules. *See* Cardinal Decl. ¶ 8.

III. *MOTION TO DISMISS STANDARD.*

■ A motion to dismiss pursuant to the *Feres* doctrine is properly treated as a Fed.R.Civ.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Jackson v. United States,* 110 F.3d 1484, 1486 (9th Cir.1997) (stating that the district court erred in analyzing the *Feres* doctrine as a motion for summary judgment, rather than a motion for lack of subject matter jurisdiction). *Accord Dreier v. United States,* 106 F.3d 844, 847 (9th Cir.1996).

■ A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may either attack the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or may attack the existence of subject matter jurisdiction in fact. *Thornhill Publ'g Co., Inc. v. General Tel. & Elecs. Corp.,* 594 F.2d 730, 733 (9th Cir.1979). When the motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Federation of African Amer. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996). When the motion to dismiss is a factual attack on subject matter jurisdiction, however, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject matter jurisdiction. *Thornhill,* 594 F.2d at 733.

The Government's motion is a factual attack on this court's subject matter jurisdiction. Accordingly, this court may accept and evaluate evidence to determine whether jurisdiction exists. *Dreier,* 106 F.3d at 847 ("a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court"). Although the court considers matters outside Plaintiffs' Complaint, the court resolves all disputed facts in Plaintiffs' favor. *Dreier,* 106 F.3d at 847.

■ Plaintiffs have the burden of proving that jurisdiction does in fact exist. *Thornhill,* 594 F.2d at 733. Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Rosenbaum v. Syntex Corp.,* 95 F.3d 922, 926 (9th Cir.1996).

IV. *ANALYSIS.*

■ Under the FTCA, the Government is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. However, the Government is not liable under the FTCA "for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950). *Accord Dreier,* 106 F.3d at 848; *Millang v. United States,* 817 F.2d 533, 534–35 (9th Cir.1987), *cert. denied,* 485

U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988). This exception to FTCA liability is known as the *Feres* doctrine.

■ Whether the *Feres* doctrine bars an FTCA claim is a question of law. *Jackson v. United States*, 110 F.3d 1484, 1486 (9th Cir.1997). Courts applying the *Feres* doctrine have given it a broad reach, barring recovery by members of the armed services for injuries that may not appear to be closely related to their military service or status. *Jackson*, 110 F.3d at 1486–87 ("practically any suit that implicates the military judgments and decisions runs the risk of colliding with *Feres*") (quoting *Persons v. United States*, 925 F.2d 292, 295 (9th Cir.1991)); *Dreier*, 106 F.3d at 848.

■ When the application of the *Feres* doctrine is not clear, the Ninth Circuit looks to four factors to determine whether an activity is incident to military service and therefore barred: (1) the place where the negligent act occurred; (2) the duty status of the plaintiff when the negligent act occurred; (3) the benefits accruing to the plaintiff because of his status as a service member; and (4) the nature of the plaintiff's activities at the time the negligent act occurred. *Costo v. United States*, 248 F.3d 863, 867 (9th Cir.2001), *petition for cert. filed*, —— U.S. ——, 122 S.Ct. 808, 151 L.Ed.2d 693 (2001); *Jackson*, 110 F.3d at 1487; *Dreier*, 106 F.3d at 848; *Bon v. United States*, 802 F.2d 1092, 1094 (9th Cir.1986). None of these factors is dispositive. *Costo*, 248 F.3d at 867. The key inquiry is whether the suit requires this court to second-guess military decisions, and whether the suit might impair military discipline. *Millang*, 817 F.2d at 535. Thus, the Ninth Circuit has stated that "the most important line of inquiry is

the nature of the plaintiff's activities at the time of the government's tortious action." *Bon*, 802 F.2d at 1094.

■ The Ninth Circuit has recently noted that cases applying the *Feres* doctrine are irreconcilable. *Costo*, 248 F.3d at 867. Accordingly, a comparison of fact patterns in cases that have applied and not applied the *Feres* doctrine is the most appropriate way to resolve *Feres* doctrine cases. *Id.; Dreier*, 106 F.3d at 848–49. *See also Bon*, 802 F.2d at 1093 (application of the *Feres* doctrine involves a case-by-case analysis).

## A. *Analogous Claims Have Been Barred.*

In the landmark *Feres* decision, the Supreme Court reviewed three lower court cases. The common fact underlying the three cases was that each claimant, while on active duty in the military and not on furlough, was injured by the alleged negligence of other military personnel.[4] *Feres v. United States*, 340 U.S. 135, 138, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In barring the claims, the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146, 71 S.Ct. 153.

Since the Supreme Court's decision in *Feres*, the Ninth Circuit has applied the *Feres* doctrine to bar claims in other circumstances. In deciding the present case, this court has been guided by its review of the manner in which the Ninth Circuit has weighed the facts of the cases in which it has applied the *Feres* doctrine.

In *Costo*, a recent and factually analogous case, the Ninth Circuit reluctantly

---

**4.** It appears that the military no longer uses the term "furlough." Instead, it appears to use the term "authorized leave." "Authorized leave" appears to be the equivalent of a civilian's vacation.

applied the *Feres* doctrine to bar claims brought by the estates of two dead service-persons. Nollie Costo and Christopher Graham were killed while off-duty and on liberty during a recreational rafting trip sponsored by the United States Navy.[5] *Costo*, 248 F.3d at 864. Just as the rental cabins at WARC are part of the Army's MWR program, the Navy-sponsored rafting trip in *Costo* was part of an MWR program intended to contribute to the morale, well-being, and quality of life of Navy personnel and their families. *Id.* at 864–65. The MWR program, according to Navy regulations, is a command function of commanding officers. *Id.* at 865. In *Costo*, the commanding officer responsible for supervising the MWR rafting program was Capt. John Schork. As in the present case, in *Costo*, military personnel supervised several layers of civilian employees, including the manager of the outdoor recreation center that implemented the rafting program. *Id.*

The Ninth Circuit applied the four-factor test to determine that the actions were barred by the *Feres* doctrine. First, although the accident occurred off-base, the Ninth Circuit noted that the actual place of the accident was not controlling. Instead, the "appropriate consideration is the 'situs of the negligence,' not the location of the accident." *Id.* at 868. The Ninth Circuit concluded that much of the alleged negligence was supervisory, occurring on base. *Id.* Accordingly, alleged negligence off-base by civilians did not prevent the application of the doctrine. Second, although Costo and Graham were on "liberty" at the time of the accident, they were on active duty status. It appears that this weighed in favor of the *Feres* bar. *Id.* at 867. Third, the rafting program was provided as part of the Navy's MWR program and

therefore was a benefit of military service, even though the program appears to have been open to civilians such as family members of those in the military. *See id.* at 865, 867. Finally, the Ninth Circuit noted that "it has long been recognized ... that military-sponsored activities fall within the *Feres* doctrine, regardless of whether they are related to military duties." *Id.* at 868. The Navy-sponsored rafting trip, even though recreational, was sufficiently military in nature to support the bar. *Id.* at 869.

*Costo* is consistent with previous Ninth Circuit precedent holding that claims by servicepersons arising out of injuries received while participating in recreational MWR programs are barred by the *Feres* doctrine. *Bon v. United States*, 802 F.2d 1092 (9th Cir.1986), is another case factually analogous to the present action. Bon was a member of the Navy on active duty who was injured when the canoe she was renting was hit by a Government-owned motor boat operated by another service member on active duty. Bon had rented the canoe from the Special Services Center at the Naval Training Center in San Diego. *Id.* at 1093. The purpose of the Special Service Center was to provide Navy personnel and their dependents with a varied program of leisure and recreational activities to contribute to the mental and physical well-being of the participants. *Id.* Accordingly, it appears to have been part of the MWR program. Neither Bon nor the operator of the motor boat was engaged in official duties at the time of the accident. *Id.*

Applying the four-factor test applicable to whether an activity is incident to military service, the Ninth Circuit held that Bon's activities were sufficiently incident to her military service that the court

---

**5.** "Liberty" appears to refer to the off-work period of time in a Navy person's daily life, generally including the time before and after work and weekends.

lacked jurisdiction over her claims against the Government. *Id.* at 1095. The court noted that, although the location of an accident was not controlling, it was an important factor. *Id.* Thus, the first factor supported a *Feres* bar because Bon's accident occurred on or near the Special Services Center. *Id.* The second factor— Bon's duty status—also supported the bar. Both Bon and the driver of the motor boat were on active duty, but on liberty. *Id.* The third factor—the benefits accruing to Bon as a service member—supported the bar because Bon's entitlement to use the Special Services Center flowed "solely by virtue of her status as a member of the military." *Id.* The record indicated that the use of the Special Service Center was restricted to members of the military, employees of the Department of Defense, and their guests and dependents. *Id.* Finally, the nature of Bon's activity, the fourth factor, was such that its entire scope was subject to military orders and discipline for violation of the Special Services Center's rules governing use of its equipment and facilities. *Id.*

The *Feres* doctrine has also barred suits arising out of recreational activities that were not associated with an MWR program. For example, in *Millang v. United States,* 817 F.2d 533 (9th Cir.1987), *cert. denied,* 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988), an off-duty member of the Marine Corps was attending a picnic on a military base when an on-duty military police officer hit him with a military police vehicle. *Id.* at 534. The Ninth Circuit noted that *Feres* prohibits not only those suits that directly question military decisions, but also the type of claim that would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness. *Id.* at 535. The Ninth Circuit examined the "totality of the circumstances," concluding that Millang's accident arose out of an activity incident to service. The Ninth Circuit was particularly concerned that, even though Millang was engaged in an off-duty recreational activity, his suit challenged the conduct of an on-duty military police officer acting within the scope of his military authority. *Id.* The Ninth Circuit concluded that this was the type of suit that might call into question military discipline. Accordingly, the Ninth Circuit concluded that Millang's suit was barred by the *Feres* doctrine. *Id.*

Not only has the *Feres* doctrine barred actions arising out of military-sponsored recreational activities, it has also barred actions by plaintiffs injured while receiving medical treatment from military doctors. In *Jackson v. United States,* 110 F.3d 1484 (9th Cir.1997), for instance, Jackson, a Navy reservist, cut his hand during weekend inactive-duty training. Jackson was examined and treated at a Navy hospital and was told to return the next day. When he returned, Jackson was told to get administrative authorization for his medical care. Jackson claimed that the doctors were negligent in not telling him that he needed to have surgery within seven to ten days of the injury to avoid permanent nerve damage. *Id.* at 1486.

The Ninth Circuit applied the four-factor test in determining that Jackson's claims were barred. The first factor— place of negligence—weighed in favor of a bar. Jackson was allegedly harmed by the negligence of doctors treating him at a Navy hospital inside a guarded military facility. The panel noted that the Navy hospital did not treat members of the general public. The second factor—Jackson's duty status—was not as clear. The panel noted that previous Ninth Circuit authority had stated that the relevant distinction for the second prong of the *Feres* test ran between servicepersons on "active duty" and servicepersons on furlough or after

discharge, not between "off-duty" and "on-duty" servicepersons. *Id.* at 1488. Noting that this statement was merely dicta, *Jackson* stated that a soldier's duty status at the time of the injury was merely "relevant." *Id. Jackson* viewed duty status as a continuum ranging from active duty to discharge, with *Feres* clearly applying to a serviceperson who was on active duty but not to one who had been discharged. The Ninth Circuit held that, when a serviceperson's status "falls somewhere in the middle of the continuum, then duty status is less important and we look to the other factors," according less weight to the duty status factor. *Id.* The Ninth Circuit concluded that Jackson's status as a military reservist lent some support to the application of the *Feres* bar. The third factor—benefits received by Jackson—clearly weighed in favor of the *Feres* bar. Jackson received military disability compensation for his injury and subsequent complications. He received cost-free treatment at the Navy hospital pursuant to his military benefits. *Id.* at 1488–89. The fourth factor—the nature of Jackson's activities—also weighed in favor of the bar, as Jackson's injury flowed from his engagement in a military activity. *Id.* at 1489.

The *Feres* doctrine has even barred an action by a military serviceperson who, while essentially on vacation, was allegedly injured by a civilian. In *Uptegrove v. United States*, 600 F.2d 1248 (9th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 732, 62 L.Ed.2d 730 (1980), the family of a serviceman killed in a plane crash sued the United States for the alleged negligence of three Federal Aviation Administration ("FAA") air traffic controllers. *Id.* at 1248–49. Uptegrove, on leave from his post in the Philippines, had traveled to Japan and then boarded a military transport plane on a space-available basis to visit his family in San Diego. *Id.* at 1249. Uptegrove was killed after an FAA air traffic controller requested that his plane descend to an altitude of 5,000 feet. Less than two minutes later, Uptegrove's plane collided with Mount Constance at an altitude of 7,150 feet. *Id.* The Ninth Circuit held that the *Feres* doctrine applied even though the alleged tortfeasors were FAA air traffic personnel. *Id.* at 1251. The Ninth Circuit recognized that, although Uptegrove was on leave and voluntarily on the transport plane, he was still subject to military discipline on that plane. *Id.* at 1250. This was enough for the Ninth Circuit to hold that the *Feres* doctrine barred his claims. In reaching this holding, the Ninth Circuit noted that the "Supreme Court has never indicated that *Feres* should be limited only to situations in which interference with military discipline is threatened." *Id.*

### B.  *Claims Are Not Always Barred.*

Of course, the *Feres* doctrine does not bar every claim a member of the military might bring against the United States. This court is also guided by the Ninth Circuit's reasons for finding *Feres* inapplicable in certain situations.

In the case that Plaintiffs rely most heavily on, *Dreier v. United States*, 106 F.3d 844 (9th Cir.1996), the Ninth Circuit concluded that *Feres* did not bar a suit arising out of the death of a soldier who fell into a steep wastewater drainage channel after an off-duty afternoon of relaxation and beer drinking. Dreier had been "released from duty at noon." *Id.* at 846. He drove off-base, changed out of uniform, went shopping, and then drove to Solo Point, a place back on the military base. After drinking beer with others, Dreier went for a hike, fell into a steep drainage channel, and died. *Id.* at 846, 852–53. While holding that *Feres* did not bar the claims against the United States for his

death, the Ninth Circuit noted that *Dreier* was "a close case." *Id.* at 847.

Examining the totality of the circumstances, the Ninth Circuit concluded that Dreier's death was not incident to his service. *Id.* at 852. Because he was on a military base at the time of his death, the first factor weighed in favor of the *Feres* bar. However, the Ninth Circuit noted that his presence on the base was not determinative. *Id.* The second factor weighed slightly in favor of not finding a bar, as Dreier had been released from duty for the day, and the Ninth Circuit found that fact "relevant." [6] *Id.* at 853. The third factor weighed in favor of no *Feres* bar, as Dreier's presence at Solo Point "was indistinguishable from that of a civilian participating in the same leisurely activities." Under base rules, civilians could gain access to that area of the base by obtaining a permit. Indeed, the Ninth Circuit noted that civilians sometimes used the Solo Point area without obtaining any pass or going through any checkpoint. *Id.* at 853. Because the Solo Point area was "generally open to the public, at least with an easily acquired pass," the panel concluded that *Dreier* was distinguishable from *Bon* and *Millang*. *Id.* at 853. In so concluding, the Ninth Circuit recognized that, when a military member is injured or killed while enjoying recreational or medical benefits, an "often determinative factor" in barring the member's claims under the *Feres* doctrine is the connection between those benefits and the person's military status. When benefits are available because of military status, claims may well be barred. *Id.* at 849. The Ninth Circuit also concluded that Dreier was subject to

military discipline only in the "remotest sense." *Id.* at 849–50.

Unlike the plaintiff in *Bon*, who was subject to administrative regulations regarding use of a rented canoe, Dreier was not subject to military orders and regulations for hiking. *Id. Dreier* involved no allegations of inadequate military supervision or training. Instead, that case alleged the type of negligence for which a private water treatment plant maintaining a drainage channel could have been liable. *Id.* at 854.

Other Ninth Circuit case law indicates that the *Feres* doctrine will not bar a suit when the serviceperson's injuries have no relationship to military duties. For example, in *Green v. Hall*, 8 F.3d 695 (9th Cir.1993), *cert. denied*, 513 U.S. 809, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994), the Ninth Circuit held that the *Feres* doctrine did not bar a plaintiff's suit against the estate of another serviceman. In *Green*, an Army reservist was injured in a car accident offbase. The reservist had left the base to eat breakfast before he was due at morning formation. *Id.* at 697–98. The Ninth Circuit held that Greene's injuries were not incident to his military service, but instead the result of a "distinctly nonmilitary act." *Id.* at 700. Greene had not left base under orders, did not intend to benefit the military by going off-base, and was not injured on military property. *Id.*

Similarly, in *Johnson v. United States*, 704 F.2d 1431 (9th Cir.1983), the *Feres* doctrine did not apply to claims by the estate of a serviceman who was killed while riding in a car off-base that was driven by another serviceman. *Johnson*

6. The Ninth Circuit commented that "Ronald's case would be stronger if he were on furlough, rather than merely off-duty for the afternoon." *Id.* at 853 n. 8. This comment suggests that, in the present case, which involves someone who was on authorized leave, the second factor may weigh in favor of no

*Feres* bar. However, as discussed above, subsequent Ninth Circuit case law indicates that duty status is not as important as other factors if, at the time of the injury, the duty status is somewhere between active duty and discharge. *Jackson*, 110 F.3d at 1488.

was on his way home at about 4:30 in the morning after partying at a noncommissioned officers' club on the military base. The partying had occurred after Johnson had completed his duties at the club as a bartender, a job he held during his off-duty hours. The club had closed for the evening. *See id.* at 1433.

*Johnson* applied the four-factor test to determine that the estate's claims were not barred. As to the first factor (the location of the negligence), the panel held that Johnson's work as a bartender on the base "should not obscure the fact that Johnson was performing a non-military job in what was essentially a civilian context." *Id.* at 1437. With respect to the second factor (Johnson's duty status), the panel stated that the important question was whether the serviceperson on active duty status was engaging in an activity that was related in some relevant way to his military duties. The panel concluded that Johnson's off-duty work as a bartender had no relevant relationship to military duties. *Id.* at 1438. With respect to the third factor (benefits accruing due to status as a serviceperson), the panel distinguished other case precedent that applied the *Feres* doctrine to bar suits when servicepersons had access to various recreational and medical benefits solely because they were in the military. The panel concluded that Johnson's employment as a bartender during his off-duty hours "can hardly be characterized as a privilege or a benefit of military service." *Id.* at 1438–39. Finally, with respect to the fourth factor (the nature of Johnson's activities at the time the negligence occurred), the panel stated that "the most relevant line of inquiry is whether or not the service member's activities at the time of the injury are the sort that could harm the disciplinary system if litigated in a civil action." *Id.* at 1439. The panel concluded that Johnson essentially stood in the same position as a civilian employee at a privately owned nightclub.

*Id.* Accordingly, the panel found that there was no relevant relationship between Johnson's behavior and military interests that might be jeopardized by civil suits. *Id.* at 1440. The panel therefore concluded that the *Feres* doctrine did not bar the action. *Id.*

Like *Green* and *Johnson, Mills v. Tucker,* 499 F.2d 866 (9th Cir.1974), held that the *Feres* doctrine did not bar recovery for the death of Mills, a Navy petty officer killed when his motorcycle was struck by a car on a public road maintained by the Navy just outside a Navy ammunition depot. His widow and children sued the United States, alleging negligent maintenance of the road. *Id.* at 867. The Ninth Circuit noted that "there is no immunity where the injury does not arise out of a course of activity incident to service." *Id.* The Ninth Circuit determined that Mills was "on furlough" the day of the accident; he was returning from a civilian job in which he was moonlighting as a fry cook and was on his way to his son's birthday party in Navy-owned quarters. Mills was, according to the Ninth Circuit, "only in the remotest sense subject to military discipline." *Id.* As his death was held not to have been incident to his service in the military, the *Feres* bar did not apply. *Id.*

## C.   *The Present Case is Barred.*

▉ Given the totality of the circumstances in the present case and the Ninth Circuit's four factors applicable to determining whether Latchum's activities were incident to his military service, this court concludes that the *Feres* doctrine bars Plaintiffs' claims.

### 1.   *Factor 1: The Location of the Allegedly Negligent Conduct.*

Although the location at which Latchum was killed is not dispositive of whether the *Feres* doctrine bars his FTCA claim, it is an important factor. *See Bon,* 802 F.2d at 1095. Latchum was killed on a military

facility. This factor thus weighs in favor of a *Feres* bar in the present case. *Compare, e.g., id.* (the location of the injury on or near the Special Services Center at the Naval Training Center weighed in favor of a *Feres* bar), *with Mills,* 499 F.2d at 868 (plaintiff's injury on a road off-base weighed in favor of not applying the *Feres* bar).

More importantly, however, Plaintiffs allege inadequate security (fences, lighting, patrols, etc.) at WARC. *See* Complaint ¶ 14. Security decisions at WARC were ultimately made by military personnel. For example, Lieutenant Colonel Cardinal was responsible for major improvements such as fences and lighting; it was she who needed to obtain funding for those items. Cardinal Decl. ¶ 1. The number and type of security officers was determined by the Provost Marshal's Office, Fort Shafter, a military office. Reyes Decl. ¶ 5. This case has features reminiscent of *Costo,* in which military service-persons were killed in a rafting accident off-base and some of the alleged negligence was attributable to civilians in charge of the rafting program. The Ninth Circuit, however, noted that much of the alleged negligence was attributable to military personnel who, from their offices on a military base, supervised the civilians. *Costo,* 248 F.3d at 868. Had the matter gone forward, the court in *Costo* would have had to examine decisions made by military personnel in their supervisory capacities. The Ninth Circuit held that the negligence attributable to

civilians with day-to-day control of the MWR program was not sufficiently important to allow the suits to continue. *See id.* at 865, 868. Similarly, this court finds civilian management of WARC insufficient to allow Plaintiffs' suit to go forward in the face of the supervisory roles played by military personnel. This case is therefore distinguishable from *Dreier,* in which the Ninth Circuit concluded that questioning the Government's negligence in securing the area where Dreier was killed would not have required the court to examine military judgment. *Dreier,* 106 F.3d at 853 ("many, if not all of the employees directly overseeing the water treatment plant were civilians").

### 2. *Factor 2: Latchum's Duty Status at the Time of the Injury.*

The second factor—Latchum's duty status when he was killed—does not clearly weigh in favor of or against a *Feres* bar. Latchum was on active duty, but on an 11–day authorized leave at the time he was killed. In one of its most recent pronouncements on this factor, the Ninth Circuit stated that duty status is less important when the injured serviceperson's status falls somewhere between active duty and discharge.[7] *Jackson,* 110 F.3d at 1488.

### 3. *Factor 3: The Benefits Accruing to Latchum by Virtue of His Military Status.*

The third factor—benefits accruing to Latchum as a service member—supports a

---

**7.** The statement in *Jackson* may have flowed from case law that could not easily be reconciled. For example, in *Persons v. United States,* 925 F.2d 292, 296, n. 6 (9th Cir.1991), the panel noted in dicta that the relevant distinction runs between persons who are on active duty and those who have been discharged or are on furlough, not between off-duty and on-duty service members. *Mills,* 499 F.2d at 867–68, stated that the *Feres*

doctrine did not apply to a plaintiff who was on furlough, among other factors. However, the Ninth Circuit applied *Feres* to bar claims arising from the death of a serviceperson who was traveling on "leave" when his plane crashed. *Uptegrove,* 600 F.2d at 1249–50. While *Persons, Mills,* and *Uptegrove* all involved what were essentially vacations, the Ninth Circuit did not reach the same result in all three cases.

*Feres* bar. In *Costo* and in *Bon*, this factor weighed in favor of a bar because the servicepersons enjoyed the use of the canoe and boat rental services by virtue of their status as members of the military. *Costo*, 248 F.3d at 867; *Bon*, 802 F.2d at 1095. *Costo* and *Bon* are particularly instructive here. They both involved MWR programs. Similarly, this case involves a facility provided as part of an MWR program. This case is therefore distinguishable from cases like *Johnson*, in which the Ninth Circuit specifically concluded that the serviceman's off-duty employment as a bartender was not a benefit of military service. In so concluding, *Johnson* specifically noted that the case did not involve injury to a soldier who was using military medical facilities or participating in recreational activities sponsored by the military. *Johnson*, 704 F.2d at 1439.

Here, Plaintiffs contend that, because civilians (DOD employees and federal employees) may use WARC, and because local "hoodlums" commit crimes at WARC, this case is like *Dreier*. However, it appears that, as a practical matter, very few civilians are able to use WARC cabins. For example, on the day Latchum was killed, only one cabin had been rented by a civilian DOD employee.[8] This case is similar to *Bon*, which noted that civilian DOD employees could use the Special Services Center. The Ninth Circuit nevertheless concluded that Bon's use of the facility arose solely from her status in the military. *Bon*, 802 F.2d at 1095. Latchum's use of WARC can similarly be said to have been a benefit that derived from his military status.

Moreover, although civilians can go through WARC property to get to the beach, and although some civilians may commit crimes at WARC, those civilians are apparently confronted if they are found out of the permissible area. The permissible area clearly did not include Latchum's cabin or the cabin porch. Accordingly, *Dreier* is again distinguishable. In *Dreier*, the Ninth Circuit noted that the deceased serviceman was not present at the hike because of his military status. Instead, the area in which Dreier was killed was basically open to the public. *Dreier*, 106 F.3d at 853. That is not the case here.

### 4. Factor 4: The Nature of Latchum's Activities at the Time he was Killed.

Finally, the fourth factor weighs in favor of a *Feres* bar. Just as the service member who rented a canoe from the Special Services Center in *Bon* was subject to military orders and discipline, Latchum was subject to Army regulations, WARC rules, and other military rules in using WARC. *See Bon*, 802 F.2d at 1095; Cardinal Decl. ¶ 8. As *Costo* recognized, military-sponsored activities, including recreational MWR programs like the WARC cabins, fall within the *Feres* doctrine, regardless of whether they are actually related to military duties. *Costo*, 248 F.3d at 868–69 ("But whatever the original scope of the *Feres* doctrine, it is clear that it has been interpreted throughout the lower courts—and specifically, by our court—to include military sponsored recreational programs"). Courts appear to recognize the value of MWR programs to military moral and other military interests. Although many of the rules that applied to Latchum may have been purely administrative, Plaintiffs have not shown that those rules are substantially different from the rules in *Bon* and *Costo*.

Plaintiffs argue that this court should merely examine what Latchum was doing at the time he was shot. Plaintiffs contend

---

8. Two cabins were empty, but the record does not reflect the reason for the vacancies.

that, because Latchum was merely standing on his porch, this case is akin to *Dreier*, in which the decedent was hiking and was only subject to military rules in the remotest sense. The court finds that this argument too narrowly construes Latchum's actions. While Latchum was standing on the porch of a WARC cabin when he was shot, he had rented that cabin as part of the Army's MWR program. That porch, unlike the place in issue in *Dreier*, was not open to nonmilitary people who were not guests or family of military personnel.

### V. *CONCLUSION.*

Under the totality of the circumstances, the court concludes that Latchum's use of WARC was sufficiently incident to his military service to bar Plaintiffs' action under the *Feres* doctrine. Accordingly, the Government's motion to dismiss is granted.

The Clerk of the Court is directed to enter judgment in favor of the Government and against Plaintiffs and to close this case.

IT IS SO ORDERED.